IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | ) ) ) | 2:07-cv-1724-GEB-CMK |
| Plaintiff, | ) ) | |
| v. | ) ) | ORDER |
| SECURE INVESTMENT SERVICES, INC.; AMERICAN FINANCIAL SERVICES, INC.; LYNDON GROUP, INC.; KIMBERLY SNOWDEN; and LINDA NEUHAUS, as Administrator and Personal Representative of the Estate of Donald F. Neuhaus, | ) ) ) ) ) ) ) ) | |
| Defendants.* | ) ) | |

Evidentiary hearings were held in this action June 30, 2008 and July 28, 2008, on Michael J. Quilling's thirteen motions to abandon life insurance policies on which Mr. Quilling, the appointed Receiver for Secure Investment Services, Inc., American Financial Services, Inc. and Lyndon Group, Inc. (collectively, "the estate"),

---

* The docket indicates that Linda Neuhaus is now deceased. (Statement of Fact of Death, July 8, 2008, Dkt. No. 217.) Since a new administrator for Donald Neuhaus's estate has not yet been appointed, the caption has not been amended to reflect Linda Neuhaus's death.

has paid 100% of the premiums since being appointed Receiver, even
though the estate does not have 100% interest in the policies.

                              I. Background

        Plaintiff Securities and Exchange Commission sought and
received appointment of Mr. Quilling as the Receiver in this civil
enforcement action, in which Plaintiff alleges Defendants engaged in a
fraudulent scheme involving the sale to investors of interests in life
insurance policies on the lives of other individuals.

        Twenty-four policies are wholly owned by the estate, and the
Receiver estimates there are potentially 660 claims which could be
filed against these policies by investors who were sold interests in
the policies, but the exact amount will not be known until claims are
filed and processed.  When the Receiver was appointed there were a
total of twenty-seven wholly owned policies, but three of these
policies have matured since the Receiver's appointment (meaning the
insured died and the estate received or is in the process of receiving
the life insurance proceeds).

        There are an additional twenty-two policies which have
multiple fractional owners; the estate is among the owners.  The
Receiver testified that there are between 200 and 500 different
investors who potentially have claims against those twenty-two
policies.  In the pending motions the Receiver seeks to abandon the
estate's interest in thirteen of these twenty-two policies so that he
is authorized to discontinue paying the premiums on the abandoned
policies.

 II. Policies Sought to be Abandoned at June 30 Evidentiary Hearing

        One of the policies the Receiver seeks to abandon is the
BIE-F&L policy.  Forty people and entities have fractional ownership

interests in that policy.  The estate owns 1.25% of that policy, and has been paying 100% of the premiums for that policy since August 2007, paying $124,800 in premiums.  The face value on that policy is $4 million.  The amount of premiums needed to keep the policy in force is $41,000 per quarter.  The current death benefit available should both insureds die would be $4,032,444.  This is what is called a second to die policy; it insures both the husband and the wife, and they both must die before a death benefit is paid.  The amount of anticipated death benefit for the estate was $50,506.76 when the premiums were paid.  The Receiver testified the amount he has already spent on premiums is almost three times what the policy is worth to the estate.

To try to resolve this premium expenditure problem, the Receiver started sending letters in February to other investors in the policy in which he asked them to consider transferring their ownership interests to the estate, so that the estate would acquire sufficient ownership interest to justify continued payment of premiums to keep the policy from lapsing or to provide the estate with enough ownership interest for the Receiver to be in a position to sell the policy. Such transferees could be given claims against the estate.  Some investors agreed to the transfer, and the total ownership interest the estate had in the policy sometime before the hearing was 56.6%, which equals a death benefit of approximately $2,282,000.

The Receiver also proposes to abandon the KIL-D Policy. There are approximately twenty-three owners of the policy.  At the time the Receiver was appointed the estate owned 4% of the policy. The quarterly premium was about $12,784; the estate has paid $41,700 in premiums to keep the policy from lapsing.  The face value on that

policy is $925,000.  The current death benefit available to the estate
if the insured died would be $37,053.88.  The Receiver made the same
offer to the investors referenced above to resolve the payment of
premium problem, and the estate's ownership percentage increased to
64.45%, which equals a death benefit of approximately $596,000.

The Receiver also proposes to abandon the SHO-I(1) Policy.
There are approximately twenty-three owners of the policy.  At the
time the Receiver was appointed the estate owned 4.49% of the policy.
So far the estate has paid about $64,000 in premiums.  The planned
premium payment per quarter is $18,750, which is $76,800 a year.  The
face value on that policy is $1.5 million.  The current death benefit
available to the estate if insured died would be $67,470.  The
Receiver made the same offer to the investors referenced above to
resolve this estate payment of premium problem, and the estate's
ownership percentage increased to 42.913%, which equals a death
benefit of approximately $643,695.

The Receiver also proposes to abandon the SLE-K(1) Policy.
There are approximately fourteen owners of the policy.  At the time
the Receiver was appointed the estate owned 0.97% of the policy.  So
far the estate has paid about $44,837 in premiums.  The face value on
that policy is $666,666.  The current death benefit available to the
estate if insured died would be $6,500.  The premium payment per
quarter is just less than $8,000.  The Receiver made the same offer to
the investors referenced above to resolve this estate payment of
premium, following which the estate's ownership percentage increased
to 63.25% of the policy, which equals a death benefit of approximately
$421,000.

1    The Receiver also proposes to abandon the SLE-K(2) Policy.
2    There are eight owners of the policy.  At the time the Receiver was
3    appointed the estate owned 0.1% of the policy.  So far the estate has
4    paid about $22,500 in premiums.  The face value on that policy is
5    $666,666.  The death benefit available to the estate if insured died
6    would be $695.73.  The premium is $33,260 a year.  The Receiver made
7    the same offer to the investors referenced above to resolve this
8    estate payment of premium problem, following which the estate's
9    ownership percentage increased to 10.63% of the policy, which equals a
10   death benefit of approximately $70,893.

11   The Receiver also proposes to abandon the SLE-K(3) Policy.
12   There are fourteen owners of the policy.  At the time the Receiver was
13   appointed the estate owned 2.6% of the policy.  So far the estate has
14   paid about $54,000 in premiums.  The face value on that policy is $1
15   million.  The death benefit available to the estate if insured died
16   would be $26,000.  The premium is $58,000 a year.  The Receiver made
17   the same offer to the investors referenced above to resolve this
18   estate payment of premium problem, following which the estate's
19   ownership percentage increased to 46.11% of the policy, which equals a
20   death benefit of approximately $461,194.

21   III. Policies Sought to be Abandoned at July 28 Evidentiary Hearing

22   The Receiver also proposes to abandon the ARM-A Policy.
23   There are four owners of the policy.  At the time the Receiver was
24   appointed the estate owned 55.8% of the policy.  So far the estate has
25   paid about $76,000 in premiums.  The face value on that policy is
26   $250,000.  The death benefit available to the estate if insured died
27   would be $139,500.  The premium is approximately $80,000 a year.  The
28   Receiver made the same offer to the investors referenced above to

1   resolve this estate payment of premium problem, following which the
2   estate's ownership percentage increased to 70.8% of the policy, which
3   equals a death benefit of approximately $177,000.

4          The Receiver also proposes to abandon the BAU-R&L(1) Policy.
5   There are twelve owners of the policy.  At the time the Receiver was
6   appointed the estate owned 1.2% of the policy.  So far the estate has
7   paid about $32,250 in premiums.  The face value on that policy is $1
8   million, but the policy's value has been reduced to $617,545 due to a
9   loan debt.  The death benefit available to the estate if insured died
10  would be $7,248.  The premium is $129,000 a year.  The Receiver made
11  the same offer to the investors referenced above to resolve this
12  estate payment of premium problem, following which the estate's
13  ownership percentage increased to 21.53% of the policy, which equals a
14  death benefit of approximately $132,957.

15         The Receiver also proposes to abandon the BER-E&B(1) Policy.
16  There are twelve owners of the policy.  At the time the Receiver was
17  appointed the estate owned 8.83% of the policy.  So far the estate has
18  paid about $43,500 in premiums.  The face value on that policy is
19  $458,770.  The death benefit available to the estate if insured died
20  would be $40,545.  The premium is $27,384 a year.  The Receiver made
21  the same offer to the investors referenced above to resolve this
22  estate payment of premium problem, following which the estate's
23  ownership percentage increased to 40.69% of the policy, which equals a
24  death benefit of approximately $186,673.

25         The Receiver also proposes to abandon the BER-E&B(2) Policy.
26  There are four owners of the policy.  At the time the Receiver was
27  appointed the estate owned 5.7% of the policy.  So far the estate has
28  paid about $39,652 in premiums.  The face value on that policy is

$447,019.  The death benefit available to the estate if insured died would be $25,490.  The premium is $23,160 a year.  The Receiver made the same offer to the investors referenced above to resolve this estate payment of premium problem, following which the estate's ownership percentage increased to 49.44% of the policy, which equals a death benefit of approximately $221,006.

The Receiver also proposes to abandon the FOW-S(1) Policy. There are twenty-four owners of the policy.  At the time the Receiver was appointed the estate owned 5.68% of the policy.  So far the estate has paid about $52,800 in premiums.  The face value on that policy is $1.5 million.  The death benefit available to the estate if insured died would be $85,327.  The premium is $40,920 a year.  The Receiver made the same offer to the investors referenced above to resolve this estate payment of premium problem, following which the estate's ownership percentage increased to 74.83% of the policy, which equals a death benefit of approximately $1.1 million.

The Receiver also proposes to abandon the QUI-W(1) Policy. There are twelve owners of the policy.  At the time the Receiver was appointed the estate owned 4.3% of the policy.  So far the estate has paid about $21,835 in premiums.  The face value on that policy is $500,000.  The death benefit available to the estate if insured died would be $21,527.  The premium is approximately $60,000 a year.  The Receiver made the same offer to the investors referenced above to resolve this estate payment of premium problem, following which the estate's ownership percentage increased to 66.65% of the policy, which equals a death benefit of approximately $333,250.

Lastly, the Receiver proposes to abandon the QUI-W(2) Policy.  There are twelve owners of the policy.  At the time the

Receiver was appointed the estate owned 3.89% of the policy.  So far
the estate has paid about $21,835 in premiums.  The face value on that
policy is $500,000.  The death benefit available to the estate if
insured died would be $19,482.  The premium is approximately $60,000 a
year.  The Receiver made the same offer to the investors referenced
above to resolve this estate payment of premium problem, following
which the estate's ownership percentage increased to 71.38% of the
policy, which equals a death benefit of approximately $356,900.

IV. The Receiver's Position

The Receiver testified he cannot sell the estate's
fractional ownership interest in a policy since "there is no market
for partial interest in a policy outside of entities such as the ones
for whom [he] was appointed as Receiver for fractional interests."  He
explained "you can't control the policy [and] you're at the mercy of
the other investors to pay their share of the premiums."  To date the
Receiver has paid the premiums for the policies with money borrowed
using credit secured by the estate's wholly owned life insurance
policies, or money received when three of the wholly owned life
insurance policies matured.

The Receiver believes he faces three options:

(1) Keep the status quo.  The Receiver believes this option
is not preferable because it entails the Receiver continuing to pay
the costly premiums on these policies even though the estate's share
of the eventual payout would not come close to reimbursing the estate
for the premiums.

(2) Charge the investors for their share of the premiums.
The Receiver believes this option would not succeed because many

investors have informed him they cannot afford to pay their share of the premiums.

(3) Abandon the estate's interest in these policies and stop paying the premiums on these policies.  The Receiver believes this is the only financially viable option.

## V. The Examiner's Position

An Examiner, Steven A. Harr, was appointed in this case to voice the collective interest of investors with respect to the Receiver's actions.  The Examiner filed a statement concerning the pending motions stating "the Examiner sees no alternative but to support the course of action proposed by the Receiver" since "the hold-out investors" who did not transfer their ownership interests to the Receiver "render the . . . policies worthless" and "[f]rom the perspective . . . of maximizing the value of the estate, it does not make sense to take from the ability to salvage the [wholly owned] policies in order to further attempt to create a positive result for this minority of investors."  (Examiner's Statement ¶ 18.)

## VI. The Investors' Positions

Several of the investors in the policies at issue propose alternatives to abandoning the policies, the thrust of which is keep the policies afloat until the policies mature.

Some investors propose that the Receiver continue to pay the premiums until the policies mature and once the policies mature, the estate should receive payment for the substantial amount of the policies the Receiver now controls.  The Receiver could then use this insurance payment to cover expenses and repay the loan, with the remainder being distributed to the investors.  However, the problem with this is that the estate would be forced to shoulder the costs of

paying the expenses and premiums, while the investors who held out and did not transfer their shares to the Receiver would benefit from a windfall.

Some investors propose that the Receiver continue to pay the premiums until the policies mature, and that once the policies mature, the Receiver interpose himself between the insurance company and the investors to collect the entire insurance payment.  Then the Receiver could repay the loan and expenses from the entire death benefits payout, and distribute the rest of the benefits to all of the investors in that policy pro rata based on their respective ownership interest.  However, the problem with this proposal is that the Receiver appears to lack the authority to interpose himself when the policy matures in order to collect the entire insurance payment directly from the insurance company.  Instead, the Receiver would be forced to collect the money from each investor individually in order to reimburse the estate, which could entail further lawsuits and more expenses to the estate.  Further, this option would require the Receiver to remain in place for an indeterminate amount of time.

Lastly, Defendant Kimberly Snowden filed an objection after the hearing in which she argues:

> Because the Receiver is in possession of the information concerning the date on which the Receiver needs to make the next payment on each policy, . . . [any order granting the motions] should be drafted in such a way as to authorize the Receiver to abandon the policy on a date certain before the Receiver is required to expend additional funds to pay premiums.  [Authoriz]ing the Receiver simply to abandon the policy "at his discretion" fails to provide enough notice to each of the investors who may wish to cooperate with the Receiver before his abandonment of the policy . . . .

(Snowden's Objection to Proposed Order, Dkt. No. 220.)  Issuing an
order directing the Receiver to determine the exact date he may be
forced to abandon each policy and to inform the affected investors may
benefit these investors; however, such an order would force the
Receiver to incur additional expenses to the detriment of the estate
which includes investors who have no interest in the policies at
issue.  Further, the affected investors have been given sufficient
notice that the Receiver's abandonment of the policies is imminent.
The letter the Receiver sent to investors stated that "[i]f some of
the [investors] indicate that they are not willing to [transfer their
interests to the estate], [the Receiver] may very well abandon the
policy and quit paying premiums, in which event partial owners . . .
will have to find a way to pay the premiums [on their own]."  (Mot.
for Authorization to Abandon the SLE-K(1) Policy, Exh. 2.)  The
Receiver's letter also stated that if investors "have any questions at
all, please call [him] and [he] will be happy to discuss the matter"
and provides a telephone number.  (Id.)  Moreover, the Receiver served
copies of his motions on each affected investor.  Thus, the expense to
the estate of obtaining an order directing the Receiver to take
further action to notify the investors about the abandonment is not
justified since the investors have already received sufficient notice
and may contact the Receiver to obtain additional information about
the Receiver's activities.

VII. Conclusion

It is evident from the record that the estate should not
continue bearing the premium expenses required to keep the thirteen
policies from lapsing, and that the Receiver should be authorized to
discontinue paying the premiums for these policies.  Equity does not

favor having the estate investors who have a minimal chance of
receiving any benefit from paying the premiums to continue paying
them.

        For the foregoing reasons,

        1. the Receiver's motion is granted and the Receiver is
authorized to abandon, at his discretion, at such time as the estate
is required to expend additional funds to pay premiums, the estate's
interest in the life insurance policy number B10090477L in the face
amount of $4,000,000.00 issued by American General Life, referred to
in Receiver's motion as the BIE-F&L Policy;

        2. the Receiver's motion is granted and the Receiver is
authorized to abandon, at his discretion, at such time as the estate
is required to expend additional funds to pay premiums, the estate's
interest in the life insurance policy number 7087159 in the face
amount of $1,500,000.00 issued by Lincoln National Life Ins. Co.,
referred to in Receiver's motion as the SHO-I(1)Policy;

        3. the Receiver's motion is granted and the Receiver is
authorized to abandon, at his discretion, at such time as the estate
is required to expend additional funds to pay premiums, the estate's
interest in the life insurance policy number 92252406 in the face
amount of $925,000.00 issued by Transamerica Occidental, referred to
in Receiver's motion as the KIL-D Policy;

        4. the Receiver's motion is granted and the Receiver is
authorized to abandon, at his discretion, at such time as the estate
is required to expend additional funds to pay premiums, the estate's
interest in the life insurance policy number UL00256941 in the face
amount of $666,666.00 issued by John Hancock Mutual Life, referred to
in Receiver's motion as the SLE-K(1) Policy;

5. the Receiver's motion is granted and the Receiver is authorized to abandon, at his discretion, at such time as the estate is required to expend additional funds to pay premiums, the estate's interest in the life insurance policy number UL00257151 in the face amount of $666,666.00 issued by John Hancock Mutual Life, referred to in Receiver's motion as the SLE-K(2) Policy;

6. the Receiver's motion is granted and the Receiver is authorized, at his discretion, at such time as the estate is required to expend additional funds to pay premiums, to abandon the estate's interest in the life insurance policy number 6278282845 in the face amount of $1,000,000.00 issued by New York Life, referred to in Receiver's motion as the SLE-K(3) Policy;

7. the Receiver's motion is granted and the Receiver is authorized, at his discretion, at such time as the estate is required to expend additional funds to pay premiums, to abandon the estate's interest in the life insurance policy number E00071834 in the face amount of $250,000.00 issued by Protective Life Insurance Company, referred to in Receiver's motion as the ARM-A Policy;

8. the Receiver's motion is granted and the Receiver is authorized, at his discretion, at such time as the estate is required to expend additional funds to pay premiums, to abandon the estate's interest in the life insurance policy number 1A2259108-0 in the face amount of $1,000,000.00 (with a current death benefit of $617,545.30) issued by Pacific Life Insurance Company, referred to in Receiver's motion as the BAU-R&L(1) Policy;

9. the Receiver's motion is granted and the Receiver is authorized, at his discretion, at such time as the estate is required to expend additional funds to pay premiums, to abandon the estate's

interest in the life insurance policy number L051178300 in the face amount of $458,770.00 issued by Allmerica Financial, referred to in Receiver's motion as the BER-E&B(1) Policy;

10. the Receiver's motion is granted and the Receiver is authorized, at his discretion, at such time as the estate is required to expend additional funds to pay premiums, to abandon the estate's interest in the life insurance policy number L053968800 in the face amount of $447,019.00 issued by Allmerica Financial, referred to in Receiver's motion as the BER-E&B(2) Policy;

11. the Receiver's motion is granted and the Receiver is authorized, at his discretion, at such time as the estate is required to expend additional funds to pay premiums, to abandon the estate's interest in the life insurance policy number 600008818 in the face amount of $1,500,000.00 issued by Southland Life Ins. Co., referred to in Receiver's motion as the FOW-S(1) Policy;

12. the Receiver's motion is granted and the Receiver is authorized, at his discretion, at such time as the estate is required to expend additional funds to pay premiums, to abandon the estate's interest in the life insurance policy number BU1060089 in the face amount of $500,000.00 issued by Mutual of Omaha, referred to in Receiver's motion as the QUI-W(1) Policy; and

13. the Receiver's motion is granted and the Receiver is authorized, at his discretion, at such time as the estate is required to expend additional funds to pay premiums, to abandon the estate's interest in the life insurance policy number BU1063056 in the face

///

///

///

amount of $500,000.00 issued by Mutual of Omaha, referred to in
Receiver's motion as the QUI-W(2) Policy.

          IT IS SO ORDERED.

Dated:  July 28, 2008

                              _____
                              GARLAND E. BURRELL, JR.
                              United States District Judge

15