IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | ) ) | 2:07-cv-01724-GEB-CMK |
| Plaintiff, | ) ) ) | ORDER[1] |
| v. | ) ) | |
| SECURE INVESTMENT SERVICES, INC.; AMERICAN FINANCIAL SERVICES, INC.; LYNDON GROUP, INC.; KIMBERLY SNOWDEN; and LINDA NEUHAUS, in her capacity as the administrator and personal representative of the estate of Donald Neuhaus, | ) ) ) ) ) ) ) ) | |
| Defendants. | ) ) | |

Plaintiff moves for summary judgment on its claims that Defendant Kimberly Snowden ("Snowden") engaged in a fraudulent scheme

---

[1]This matter was submitted without oral argument in accordance with Local Rule 78-230(c), which prescribes: "No party shall be entitled to be heard in opposition to a motion at oral arguments if opposition to the motion has not been timely filed by that party."

in violation of Section 17(a) of the Securities Act of 1933, Section 10(b) of the Exchange Act of 1934 and Exchange Act Rule 10(b)-5), and registration requirements in Sections 5 of the Securities Act of 1933. Plaintiff also seeks an order permanently enjoining Snowden from violating these anti-fraud and registration provisions, and an order requiring her to disgorge her "ill-gotten" gains. (Pl. Mot. at 2:24.) Plaintiff further requests partial final judgment be entered against Snowden under Federal Rule of Civil Procedure 54(b).

Snowden failed to timely oppose the motion. Snowden filed a motion to stay this action, which was denied. Lastly, Snowden's counsel has moved for an order allowing him to withdraw as attorney of record for Snowden.

<u>Non-Controverted Factual Showing</u>

"Starting no later than 2001, []Snowden, Donald F. Neuhaus ("Neuhaus"), Secure Investment Services, Inc. ("SIS"), American Financial Services, Inc. ("AFS"), and Lyndon Group, Inc. ("Lyndon Group")(collectively the "corporate defendants" or individually as "corporate defendant"), operated a business of offering and selling fractionalized interests in life insurance policies, an investment called 'bonded life settlements' or 'bonded senior settlements.'" (Plaintiff's Statement of Facts "SOF" ¶ 1.) Snowden and Neuhaus (her father)used the corporate defendants to operate the business at various times. (<u>Id.</u> ¶ 2.) "Defendants fractionalized and sold 52 policies to approximately 660 investors in over 20 states and obtained approximately $31.1 million in investor proceeds. The combined total return promised to investors was approximately $51.8 million." (<u>Id.</u> ¶ 3.)

/ / /

Internet websites, advertisements, mailings, and seminars were used to solicit investors and communicate with them. (Id. ¶ 4.) Defendants acquired the life insurance policies from brokers by paying a fraction of the policy's face amount. (Id. ¶ 5.)

As the investment was structured and represented to investors by Defendants, when the insured on the policy died, each investor would receive a return in the form of a pro rata share of the policy death benefit that equaled the investor's original investment plus a profit. (Id. ¶ 6.) For the insured on each policy, Defendants provided investors with a purported life expectancy estimate purportedly prepared by a physician. (Id. ¶ 7.) These estimates typically projected that the insured would die in six years or less. (Id. ¶ 8.) Many of the investments were purportedly "bonded." (Id. ¶ 9.)

As the investment was structured and represented to investors by Defendants, if the insured outlived the life expectancy, then, after a waiting period of 3 to 12 months, the bonding company would pay each investor an amount equal to the share of the policy death benefit the investor would otherwise receive from the insurance company upon the death of the insured. (Id. ¶ 10.) Defendants provided investors with copies of the bonds. (Id. ¶ 11.) Once a policy was sold to investors, premiums on the policy had to be paid to prevent it from lapsing before the insured passed away, a lapse being an event that would cause the insurance company to not pay policy benefits. (Id. ¶ 12.)

Snowden served as an officer and director for each corporate defendant and "also as the Director of Operations and Controller for the business." (Id. ¶ 13.) Additionally, "Snowden maintained the

financial records for the business, including a "QuickBooks' accounting software that recorded money flows into and out of the business; she exercised control over the bank accounts used in the business; and she wrote most of the checks to pay policy premiums." (Id. ¶ 14.)

Snowden signed agent agreements with sales agents who typically solicited investors. (Id. ¶ 15.) Also, Snowden herself offered and sold the investment directly to investors. (Id. ¶ 16.)

To effect their investments, investors signed purchase agreements between them and one of the corporate defendants. (Id. ¶ 17.) Snowden signed purchase agreements. (Id. ¶ 18.)

After sales were completed, Snowden signed letters to investors acknowledging receipt of their purchase agreements and their investments and stating the returns the investors would receive. (Id. ¶ 19.)

Snowden knew that when a policy was sold to investors, the corporate defendants should have set aside a portion of those investors' purchase funds that was sufficient to pay future premiums on the policy for the period of the life expectancy plus the waiting period. (Id. ¶ 20.) Snowden represented to investors both orally and in writing that funds would be set aside in this manner. (Id. ¶ 21.)

The purchase agreements typically contained the following representations to investors of which Snowden was familiar, and she signed purchase agreements containing the quoted representations ("typical purchase agreement language"):
/ / /
/ / /
/ / /

        a. "All of the following costs associated with the purchase of an interest of [sic] a policy are included in the investment amount: . . . A premium payment for a minimum of one year beyond the projected life expectancy of the insured, or until the policy is purchased by the bonding company, whichever comes first."

        b. "SIS [or another corporate defendant] may escrow funds for future premium payments for a minimum of twelve (12) months beyond the projected life expectancy of the insured, or longer at SIS's discretion . . ."; and

        c. "Future premiums, for a minimum of the life expectancy of the insured plus twelve (12) months, or longer at the [sic] SIS's discretion, shall be paid by SIS . . ." (Id. ¶ 22.)

The corporate defendants were responsible for paying policy premiums through the life expectancy and the waiting period. (Id. ¶ 23.) Snowden was familiar with the terms of the purchase agreements. (Id. ¶ 24.) Snowden signed purchase agreements with the representations in paragraph 22 above. (Id. ¶ 25.) In fact, future premiums were not "included in the investment amount" paid by investors because Defendants commingled investor funds immediately upon receiving them and used them to pay premiums on any policy they previously sold, to purchase any policy, to pay sales commissions for any policy, and to cover any other expense of the business. (Id. ¶ 26.)

Because of such practices, as of June 1, 2005, SIS was obligated to pay at least $869,013 in premiums on policies the business had previously sold if the insureds lived until the end of the waiting period. (Id. ¶ 27.) SIS held no funds as of this date. (Id. ¶ 28)

As of June 30, 2007, SIS was obligated to pay at least $3.1 million in premiums on previously sold policies if the insureds lived

until the end of the waiting period. SIS was also liable for $1 million in self-insurance on two polices for which AFS purported to act as the bonding company. (Id. ¶ 29.) As of this date, SIS had $162,295.08 in available cash. (Id. ¶ 30.)

In effect, Defendants' business was a Ponzi scheme. Defendants depended on raising new funds from investors in new policies to pay premiums on previously sold policies. Premiums could be "paid by" the corporate defendants as stated in the purchase agreements, and policies could be kept from lapsing, only if Defendants raised new money. (Id. ¶ 31.)

Snowden knew of the financial condition of the business. She knew that investor funds were commingled and used to pay any premium or other expense, and that premiums on previously sold policies were paid with new funds from investors in other policies. (Id. ¶ 32.) Snowden did not inform potential investors or investors of the Ponzi scheme or ensure that the sales agents did so. (Id. ¶ 33.) If investors had known about the Ponzi scheme, they would not have invested. (Id. ¶ 34.)

In 2005 and 2006, Snowden signed letters to several individuals who had already paid to become investors in a specific policy, offering them a different, new policy to invest in. (Id. ¶ 35.) By the time Snowden sent the letters, however, these individuals' money had already been spent on premiums for other policies previously sold and on general business expenses. (Id. ¶ 36.)

Snowden knew the money had been spent because she recorded the expenditures in the QuickBooks program she maintained. (Id. ¶ 37.) Snowden's letters offering the new policy did not inform the

individuals that their money had already been spent. (Id. ¶ 38.) The individuals accepted Snowden's offer and became investors in the new policy, which was purchased with new investor funds. (Id. ¶ 39.) SIS raised approximately $2 million from investors in a policy known as the Perillo policy during the period of August 2005 to June 2006. (Id. ¶ 40.) These funds were commingled with funds raised from investors in other policies, and spent in part to pay premiums on other policies. (Id. ¶ 41.) Snowden knew about these premium payments because she recorded them in the QuickBooks program she maintained. (Id. ¶ 42.)

Starting in late 2006, SIS raised about $1.7 million from would-be investors in a policy on an insured named Altrogge ("the Altrogge policy"). (Id. ¶ 43.) These funds were commingled with funds raised from investors in other policies spent in part to pay premiums on other policies. (Id. ¶ 44.) The funds were also spent in part to pay claims of investors in a policy for which AFS purported to act as the bonding company. Snowden executed documents used to pay these claims and entered the transaction in the records of the business. (Id. ¶ 45.) The expenditures of the Altrogge policy investor funds were recorded by Snowden in the QuickBooks program she maintained. (Id. ¶ 46.) SIS never acquired the Altrogge policy. (Id. ¶ 47.) Snowden sent letters to investors telling them they had become co-owners of the Altrogge policy and stating the returns the investors would receive from their investment in the policy. (Id. ¶ 48.)

Snowden sold directly to investor Routon, who, along with his wife, invested $100,000 in the Keul policy in December 2004 through the Routon Family Trust. (Id. ¶ 49.) Snowden met with

7

Routon at least four times in her office to discuss the investment and also discussed it with him by telephone. Routon told Snowden told that he wanted a safe investment, that he had been seriously injured in a vehicle accident, and that the money he had to invest was to pay for his son's college. (Id. ¶ 50.)

Snowden explained to Routon how the investment program worked. She explained the terms of the purchase agreement to him. She assured him that the investment was totally safe. (Id. ¶ 51.) Snowden told Routon that for the policy he and his wife invested in, a reserve would be established that was sufficient to pay future policy premiums until the date when the bond would pay out if the insured was still alive at the end of the life expectancy. (Id. ¶ 52.) As reflected in the QuickBooks program maintained by Snowden, none of Routon's money was reserved for future premiums. (Id. ¶ 53.)

Before Snowden's sale to Routon, in February 2003, the California Department of Corporations ordered Neuhaus and AFS to cease selling the investments that are the subject of this case. (Id. ¶ 54.) Snowden was aware of this order. (Id. ¶ 55.) She did not disclose the order to Routon. (Id. ¶ 56.) She also did not disclose the order to other investors or potential investors or ensure that others disclosed it. (Id. ¶ 57.) Investors would not have invested if they had been told about the order. (Id. ¶ 58.)

During the period of September 18, 2001 through August 17, 2007, Snowden received $574,518.45 from the corporate defendants. Because the corporate defendants' only source of income was investor money, the $574,518.45 came from investors. (Id. ¶ 59.)

Defendants managed the investment program, as detailed below (Id. ¶ 60.):

a.　As they raised funds from investors, Defendants located, negotiated for, and acquired a life insurance policy to fractionalize and sell.

　　　　　b.　Snowden ensured that the policy was not oversold to investors.

　　　　　c.　Defendants chose the bonding company for the policy and paid for the bond.

　　　　　d.　Upon selling a policy to investors, Defendants recorded the investors as beneficiaries and owners of the policy on the insurance company's records. If required, Defendants would instead make the investors beneficiaries of a trust that held the investor's policy interests.

　　　　　e.　Snowden and Neuhaus thereafter controlled payment of policy premiums, at times deciding to pay other business expenses instead of making timely premium payments, and deciding to cover premiums not with cash but with cash value that had accumulated in the policy.[2]

　　　　　f.　Defendants retained a firm to monitor the health and status of the insured and file any claim for policy benefits, and the firm reported back to an employee of the corporate defendants on a quarterly basis.

　　　　　g.　Finally, Defendants submitted and pursued any claim against the bonding company.

　　　The investors were passive participants in the investment program, with their role limited to signing purchase documents and paying for the investment. (Id. ¶ 61.) Lastly, no registration statement was on file with the Commission or in effect with respect to Defendants' offers and sales of the investments.

Analysis

　　　The uncontroverted facts show the investments sold by Defendants constitute securities under the federal securities law. See SEC v. Rubera, 350 F.3d 1084, 1090 (9th Cir. 2003)(stating "To

---

[2] "Cash value" refers to funds that can accumulate within a policy and are held by the insurance company. Cash value is an asset that belongs to the owners of the policy, and generally can be loaned to the owner or used to pay premiums in lieu of cash payments. (Eme Decl. Exh. 22 Par. 16-19.)

establish a claim for violation of federal securities law, it is necessary to show that the violation involved a "security" as defined by the Securities Acts [;and,] distill[ing] [the] definition [of a security] into a three-part test requiring (1) an investment of money (2) in a common enterprise (3) with an expectation of profits produced by the efforts of others." (internal citations and quotations omitted).

Whether Snowden Violated the Anti-Fraud Provisions

Plaintiff contends the uncontroverted facts show Snowden violated the anti-fraud provisions of the federal securities laws. "Under [the antifraud] provisions . . . [Plaintiff] must prove three basic elements: (1) [that Snowden made] misrepresentations or omissions of material fact[ ]; (2) with the requisite mental state; and (3) in connection with a purchase, offer, or sale of securities." SEC v. Yuen, 2005 U.S. Dist. LEXIS 41231 (C.D. Cal. 2005).

The uncontroverted facts show Snowden misrepresented to numerous investors that portions of their investments would be set aside for the purpose of paying future premiums. Further, Snowden told investors in the Altrogge policy that SIS owned this policy and that their investments were put towards this policy. However, SIS never owned the Altrogge policy. These misstatements and omissions were material because investors relied upon these misstatements and omissions in making their investments. Finally, the uncontroverted facts show Snowden knew the investors' funds were being misused yet she continued to misrepresent the truth to investors. Accordingly, Plaintiff's motion on this claim is granted.

/ / /

/ / /

Whether Snowden Violated the Registration Provisions

Plaintiff also argues the uncontroverted facts show Snowden violated the registration provisions of the federal securities laws. "To establish this claim, [Plaintiff] must point to evidence that: (1) no registration statement was in effect as to the securities; (2) [Snowden] sold or offered to sell the securities; and (3) the sale or offer was made through interstate commerce." Berckeley Inv. Group, Ltd. v. Colkitt, 455 F.3d 195, 212 (3rd Cir. 2006). The uncontroverted facts show that no registration statement was ever filed with Plaintiff for the securities sold by Defendants; and that Snowden played a key role in selling these investments. Therefore, Plaintiff's motion is granted on this claim.

Whether Snowden Should be Permanently Enjoined

> Plaintiff also seeks to obtain a permanent injunction, [Plaintiff] ha[s] the burden of showing there [i]s a reasonable likelihood of future violations of the securities laws . . . [T]here is no per se rule requiring the issuance of an injunction upon the showing of [a] past violation, but . . . the existence of past violations may give rise to an inference that there will be future violations; and the fact that the defendant is currently complying with the securities laws does not preclude an injunction.
>
> In predicting the likelihood of future violations, [courts] assess the totality of the circumstances surrounding the defendant and h[er] violations, and [ ] consider such factors as (1) the degree of scienter involved; (2) the isolated or recurrent nature of the infraction; (3) the defendant's recognition of the wrongful nature of his conduct; (4) the likelihood, because of defendant's professional occupation, that future violations might occur; (5) and the sincerity of his assurances against future violations.

United States SEC v. Fehn, 97 F.3d 1276, 1295-1296 (9th Cir. 1996)(internal quotations and citations omitted).

Plaintiff has not shown an injunction is necessary. Therefore, this portion of the motion is denied.

## Whether Snowden Should Be Disgorged of Her Ill-Gotten Gains

Plaintiff also seeks an order requiring Snowden to disgorge her ill-gotten gains from violations of the securities laws. This equitable remedy "is designed to deprive a wrongdoer of unjust enrichment, and to deter others from violating securities laws by making violations unprofitable." SEC v. First Pac. Bancorp, 142 F.3d 1186, 1191 (9th Cir. 1998)(internal quotations and citations omitted). The uncontroverted facts show Snowden received $574,518.45 in investor money from the corporate fraud scheme. Further, Plaintiff has proffered uncontested evidence that it should be awarded prejudgment interest of $53,103.32. Therefore, Snowden shall pay a total of $627,621.77 in disgorgement and prejudgment interest.

## Partial Final Judgment

Plaintiff also requests partial final judgment be entered against Snowden under Rule 54(b). However, Plaintiff has not shown sufficient justification for entry of partial final judgment.

## Snowden's Counsel's Motion to Withdraw

Lastly, on March 2, 2009, Snowden's counsel filed a motion to withdraw as Snowden' attorney. However, in light of the present status of this case this request appears moot and is therefore denied.

## Conclusion and Order Vacating Final Pretrial Conference Requiring Status Report

For the reasons stated, Plaintiff's motion is granted and denied in part and Snowden's Counsel's motion to withdraw is denied. Since Plaintiff's summary judgment motion has been granted, the final pretrial conference scheduled for June 22, 2009 is vacated. Further, a status report shall be filed within twenty (20) days of the date on

which this Order is filed in which the status of this action shall be explained, including the remedies issues involved in the entity defendants.

Dated:  May 22, 2009

_____
GARLAND E. BURRELL, JR.
United States District Judge